IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**GERADUS GEORGE DHOOGE**                                            **PETITIONER**

vs.                                        Case No. 4:25-cv-693-JM

**ANNA ELISABETH PRONKER**                                           **RESPONDENT**

## ORDER

Geradus George Dhooge (Petitioner) brings action for the return of his fourteen-year-old son (J.D.) to the Netherlands under the under the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention, or Convention).[1] Petitioner claims that J.D.'s mother, Anna Elisabeth Pronker (Respondent), wrongfully removed J.D. to the United States. An evidentiary hearing on the petition was held on July 18, 2025. The Court ruled from the bench that Petitioner had met his burden of proof, and that J.D. would be ordered returned to the Netherlands. This order memorializes that bench ruling.

## Background

Petitioner and Respondent entered a registered partnership under Dutch Civil Law in December of 2010. Their son, J.D., was born on January 13, 2011. The parties divorced in February of 2014. The parenting plan incorporated into the divorce order gave both parties parental authority over J.D and provided for Petitioner to have his son on Fridays and Saturdays. (See verified petition, Exhibit G.) Until July 24, 2025, the parties and their son lived in the Netherlands.

Petitioner testified that at the end of 2020, Respondent increasingly failed to keep the court-ordered visitation appointments. Petitioner went to the Dutch court asking that the

---

[1] As implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq*.

parenting plan be followed. The Dutch court involved the Salvation Army (referred to by the U.S. Department of State as "the local social services"; *see* Verified Petition, Exhibit G). According to Petitioner, this meant that the Salvation Army also got a say on how things were going to proceed with J.D.  The Dutch court order providing for Salvation Army supervision went into effect on July 9, 2021 and was extended several times. In August of 2023, the visitation schedule was modified to give Petitioner contact with his son for three hours every three weeks.

      At a hearing on June 5, 2025 regarding an additional extension of the supervision, a Dutch juvenile judge heard from J.D., Respondent, and the Child Protection Board. Petitioner did not attend. The juvenile judge agreed to extend the supervision order for six months based on the judge's assessment that in spite of various efforts, "contact between [J.D.] and his father has not been reestablished," that there was an "impasse" and "continued mandated intervention is no longer in [J.D.'s] best interest." Respondent's Exhibit 1. The juvenile judge also stated that "[s]upervision should end carefully, potentially allowing future contact if [J.D.] is ready" and cautioning that a "well-developed transition plan is required." *Id.* A further order entered on July 15, 2025, stated that J.D. is showing "increasing resistance and emotional distress" related to contacts with his father. Respondent's Exhibit 2. The judge found that in was "inappropriate to impose a fixed contact schedule at this time" and stipulated that "contact shall take place based solely on [J.D.'s] needs." *Id.* The judge emphasized the need "for a careful transition plan outlining how to respond if [J.D.] later wishes to resume contact." *Id.*

      Throughout this time, Petitioner readily gave Respondent permission to travel with J.D. to the United States for vacation. Most recently, the parties signed a consent form for J.D. to travel with his mother to visit the U.S. between July 1 and August 31, 2024.  Petitioner found out

in October 2024 that his son had not returned from the U.S. He filed a Request for Return with the Dutch Central Authority and with the U.S. Dept of State, Central Authority. Responded did not ask Petitioner, or the Dutch court, for permission to allow J.D. to move to the United States permanently. Respondent testified that during this time he had some contact with J.D. but that in August, J.D. stopped responding to him. He tried reaching out to Respondent but did not get a response from her. Petitioner was still expecting J.D. to be back in the Netherlands when his new school year would have started in August. In the absence of any communication from J.D. or Respondent, Petitioner contacted the Salvation Army, filed a police report, and contacted the central authority in the Netherlands about his son's wrongful removal.

## Discussion

The Hague Convention "entitles a person whose child has wrongfully been removed to or retained in the United States to secure the prompt return of the child to the child's country of habitual residence, unless the respondent can establish that an affirmative defense applies." *Custodio v. Samillan,* 842 F.3d 1084, 1087 (8th Cir. 2016); *see also* 22 U.S.C. § 9001(a). "It is the Convention's core premise that "the interests of children ... in matters relating to their custody" are best served when custody decisions are made in the child's country of "habitual residence." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (citing to the Convention Preamble).

To establish a prima facie case for return of a child under the Convention, "a petitioner must show, by a preponderance of the evidence, that: (1) immediately prior to removal or retention, the child habitually resided in another Contracting State; (2) the removal or retention was in breach of the petitioner's custody rights under that State's law; and (3) the petitioner was exercising those custody rights at the time of the removal or wrongful retention." *Custodio* at 1088-89. If a petitioner establishes a prima facie case, the child must be "promptly returned

3

unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4) *Custodio v. Samillan*, 842 F.3d 1084, 1088–89 (8th Cir. 2016).

The parties stipulated that J.D. was a habitual resident of the Netherlands until approximately July 24, 2024. The Court finds that Respondent's unilateral decision to permanently move J.D. to the United States was in breach of Petitioner's custody rights established in the Netherlands. While he did not have a set visitation schedule, the parenting plan provisions from the 2014 divorce order were still in effect but for the physical custody terms. Under this order, both parents had joint authority and responsibility to inform each other of "everything related to the child's mental and physical wellbeing" as well as "changes to the child's housing or living conditions such as relocations or new household members." Petition's Exhibit 3. Respondent testified credibly that he was attempting to maintain contact with his son and had sought court intervention to enforce his rights. Furthermore, "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996). The Court finds that Petitioner met his burden of establishing a prima facie case for the return of J.D. to the jurisdiction of the Dutch court.

Respondent raises two defenses to J.D.'s return to the Netherlands. Pursuant to article 13(b) of the Convention, Respondent attempted to establish that there was a "grave risk of harm" that returning J.D. to the Netherlands would expose him to physical or psychological harm. This is a narrow exception and must be proved by clear and convincing evidence. 22 U.S.C. §9003(e)(2). The evidence before the Court is that father and son had a strained relationship, and that J.D. did not feel comfortable with his father. The Dutch court was aware of the situation, of

4

J.D.'s increasing distress at having contact with his father, and the court had involved social services for several years in an effort to support and improve the father-son relationship. Under the most recent orders of the Dutch court, J.D. was not required to be in his father's physical custody and contact was to occur only at J.D.'s instigation.  Under these circumstances, the Court finds that Respondent has failed to establish the grave risk of harm exception. "The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence." *Friedrich* at 1068.

Respondent also attempted to establish the mature child defense found in Article 13 of the Hague Convention, which provides that a judicial or administrative authority may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Dubikovskyy v. Goun*, 54 F.4th 1042, 1048 (8th Cir. 2022). J.D. testified that he would prefer to stay in the United States with his mother.[2] When questioned, J.D. stated he did not know his current address, including which city he lived in, after leaving there for almost a year. He testified that he would prefer to stay in the United States because he did not like it at his father's house; he did not like his father telling him that he's not allowed to miss his mom or to have friends over; he did not like his father sending him pictures of his half siblings, which his father knew he missed, or of the fishing boat that he liked to be on. J.D. also testified that his father had hit him one or two times, but not within the last five years. The issue of physical abuse was not introduced by any other witness, and the Court does not find J.D.'s testimony of having been hit credible or relevant to these proceedings. Based on his testimony and demeanor on the stand, the Court finds

---

[2] When he was asked if he had an objection to going back home to the Netherlands, he responded that he did not understand.

that he was not mature enough to make decisions on his own behalf about living in the Netherlands or the United States.

## Conclusion

After consideration of the evidence presented, the Court finds that Petitioner established that J.D. was wrongfully removed to the United States and should be promptly returned to the Netherlands. Respondent failed to establish one of the narrow defenses that would prevent the Court from ordering his return. Respondent has not requested the Court to consider undertakings, or conditions on the child's return, that could ameliorate any potential risk of harm. As announced in open court, the Court orders Respondent to promptly return J.D. to the Netherlands.[3] The Court recognizes the July 15, 2025 custody determination of the Dutch court, and this order does not attempt to alter that Court's order in any way.

IT IS SO ORDERED this 14th day of August, 2025.

_____
United States District Judge

---

[3] The Court received an email from Petitioner's counsel that her client was informed by law enforcement in the Netherlands that J.D. was back in the country on or about August 10, 2025.